Hawkins J.,
delivered the opinion of the Court.
On the 14th of August, 1866, Erancis Furman and Francis W. Green, citizens of Davidson County, Tenn., filed their petition in the Circuit Court of said county, against P. L. Nichol, Clerk of the County Court of said county, for a writ of mandamus. The petition alleges, in substance, that, on the 1st day of August, 1866, petitioners entered into partnership, under the name and style of Furman, Green & Co., as wholesale merchants, in the city of Nashville. Prior to that time, the petitioner, Furman, had been a wholesale licensed merchant in the city of Nashville; and, as such, said clerk, on the 28th day of August, 1865, issued to him a wholesale yearly license, for the year next ensuing. On the 3d day of August, 1866, said Furman appeared before said clerk, at his office, and tendered to him a statement, under oath, of the invoice cost of all the goods which had been brought into his said mercantile establishment for sale, since the date of his said license, up to that time. Upon said statement, there were taxes due the County of Davidson, the sum of $833.65, which sum was tendered said clerk, in lawful currency of the United States, and which he refused to accept, unless said Furman would also pay the taxes due the State in like currency.
Upon said statement, there was due, from said Fur-man to the State, as State tax, the sum of $3,534.58. *435 Furman then tendered to said clerk the sum of f3,535, in the notes and issues of the Bank of Tennessee, issued prior to the 6th day of May, 1861, in full payment and discharge of said sum of taxes, due from him to the State of Tennessee, which said clerk refused to accept, because the same were not at par.
Furman, Green & Co., also applied to said clerk for a license, as such wholesale merchants, for the next ensuing year, and tendered to him a bond as required by law, as they believed it was their right and duty to do, before they proceeded to purchase and sell goods, in the name and business of the new firm.
The clerk refused to accept the bond and to issue the license, because Furman had not paid the State tax due from him, as aforesaid, in par funds, and had only tendered and offered to pay the same in' notes and issues of the Bank of Tennessee, as aforesaid.
The petition also states, that the Bank of Tennessee was incorporated by An Act of the General Assembly of the State of Tennessee,' passed on the 19th of January, 1838, entitled, “An Act to establish a State Bank, to raise a fund for Internal Improvements, and to aid in the establishment of Education,” which Act is particularly referred to, and made a part of, the petition, so far as the same may be applicable to the rights of the petitioners.
The petition further alleges, that the bank notes tendered as aforesaid, were issued by said bank, as provided for in the twelfth section of said Act of incorporation, and made payable to bearer; that said corporation is still in existence, and the charter unre- *436 pealed; that the hank was organized, and issued its hills or notes, under the provisions of said charter, which circulated as money and legal currency, and insists petitioner, Furman, had the right to pay said taxes due from him to' the State, under a contract between him and the State.
The petitioners pray that a writ of mandamus nisi issue, directed to said Niehol, clerk, as aforesaid, commanding him, that unless, in the meantime, he receive said bank notes and bond, tendered as aforesaid, and issue said license, he appear and answer said writ, and show cause, if any he can, why a peremptory writ shall not issue against him, to compel him to receive said sum of $3,535, in the notes tendered as aforesaid, and also to issue to the petitioners a license as demanded.
A writ nisi was awarded; and Niehol having been duly served with process, appeared by his attorneys and demurred to the petition, and set down and assigned the following causes of demurrer, to-wit:
1st. “Said petition does not show that there was a contract between the State of Tennessee and the said petitioners, or either of them; that the notes of the Bank of Tennessee, held by the petitioners, should be received in payment of taxes, due to the State of Tennessee, from said petitioners.”
2nd. “Said petitioners have failed to show in their said petition, that they became the holders of the said notes, (the issues of the Bank of Tennessee,) before the passage of the Act of the General Assembly of said State, passed in 1858, entitled, £An Act to *437 revise tbe Statutes of Tennessee/ (title 4, ch. 5, art. 2, of the Code of Tennessee,) or that they became tbe holders of said notes before the passage of the Act, repealing tbe charter of the Bank of Tennessee, passed on the — day of -, 1866.”
The petitioners joined in the demurrer, and, upon argument had thereon, the same was overruled. Time was given the defendant, within which to plead, which he declined to do, and thereupon a peremptory writ of mandamus was awarded, commanding the defendant to receive of the petitioners, in payment of State tax due as aforesaid, the notes or issues of the Bank of Tennessee, issued prior to the 6th of May, 1861, and to issue to them a license, etc.; from which judgment of the Circuit Court, the defendant, Nichol, has appealed in error to this Court.
The t, question presented for our consideration in argument, and upon which, it is conceded, this case must depend, is this: "Was the Clerk of the County Court of Davidson County, bound to receive the notes of the Bank of Tennessee, tendered in payment of the taxes alleged to be due the State?
The question is one of immense magnitude, the proper solution of which involves the application of great principles, which but seldom pass in review before the judicial tribunals of this or any other country.
On the 19th day of January, 1838, the General Assembly of the State of Tennessee, passed an Act, entitled, “An Act to establish a State Bank, to raise a fund for Internal Improvements, and to aid in the establishment of a system of Education,” by which *438 was created a body corporate and politic, by the name and style of “The Bank of Tennessee,” with a capital of five millions of dollars, which, upon the happening of certain contingencies, should be increased.
By section- 12 of said Act of incorporation, it is provided, “That the bills or notes of the said corporation, originally made payable, or which shall have become payable, on demand, in gold or silver coin, shall be receivable at the Treasury of the State, and by all tax collectors and other public officers, in all payments for taxes or other moneys due to the State.”
The provisions of this section, were expressly repealed by an Act passed in 1865, ch. 36, sec. 33. This, it is admitted, the Legislature had the right to do. But it is insisted, by counsel for the plaintiff in error, that sec. 602 of the Code, which went into effect in May, 1858, operated as a repeal of said twelfth section of the bank charter.
The provisions of this section are as follows: “The collector shall receive, in discharge of public taxes, and other dues to the State, besides the constitutional and lawful currency of the United States: 1st, Such bank notes as are current and passing at par in this State. 2nd, Warrants issued by the Comptroller. 3rd, Certificates from the County Court for killing a wildcat, when offered in payment of the poll tax of the person to whom such certificate is given.”
By sec. 41 of the Code, it is declared: “All public and and general acts, passed prior to the present session of the G-eneral Assembly, and all public and special acts, the subjects whereof are revised in this *439 Code, except Acts establishing or regulating special Courts, subject to the limitations, and with the exceptions hereinafter expressed, are hereby repealed.”
And, by sec. 42 of the Code, it is declared: “Local, special, and private Acts, and Acts of incorporation heretofore passed, are not repealed, unless it be herein so expressed.”
It is not insisted that the twelfth section of the bank charter has been expressly repealed, until the passage of the Act of 1865, before referred to, but it is argued that the same was, by implication, repealed by said sec. 603 of the Code.
A legislative intention to repeal an existing Statute is never presumed, nor are implied repeals encouraged. Unless the provisions of a subsequent Statute be inconsistent with those of a prior Statute, it cannot be said that the Legislature intended to repeal it: Smith vs. Hickman’s Heirs, Cooke, 330; Hockaday vs. Wilson, 1 Head., 115. Statutes are repealed in whole, or in part, by subsequent Statutes, when the latter, referring to them, in terms declare the repeal and the extent of it, or when the provisions of the subsequent Statute, in their operation, are inconsistent with, or repugnant to, the' unchanged or unmodified operation of such former Statutes. In the latter case, the former Statutes are repealed, or changed, or modified, by the necessary implication of an express intention, on the part of the Legislature, to compass that end, to the extent, and in those particulars only, in which such inconsistency or repugnancy, exist; and this without any *440 preference even to such former Statutes, or any express declaration to that purpose: Browning vs. Jones, 4 Hump., 69.
If the Statutes are not incompatible with each other, and both can stand and have effect, an implied rep'eal does not take place, and we must give operation to both: Cate vs. The State, 3 Sneed, 120.
From these general rules, it is manifest that unless the Act of 1858 is inconsistent with, or repugnant to, the twelfth section of the Act incorporating the bank, so that both cannot stand, and effect be given to both, the Act of 1858 cannot be construed to repeal, by implication, the twelfth section of the Act of 1838. How is this?
By the latter it is enacted: “ That the bills or notes of the said corporation, originally made payable, or which shall have become payable on demand, in gold or silver coin, shall be receivable, at the Treasury of this State, and by all tax collectors and other public officers, in all payments for taxes, or other moneys due to the State.”
The Act of 1858, which, it is insisted, repeals the foregoing section of the Act of 1838, declares, that: “ Besides the lawful currency of the United States, the collector shall receive, in discharge of public taxes, and other dues to the State, such bank notes as are current and passing at par in this State, warrants issued by the Comptroller, and certificates for killing wild-cats.
This Act simply makes it the duty of the collector to receive such bank notes as are current and passing *441 at par, certain warrants and certain certificates, besides the constitutional and lawful currency of the United States, in discharge of public taxes and other dues to the State; but does not provide that he shall receive nothing else. It can, therefore, stand in perfect har-. mony with the provisions of the twelfth section of • the bank charter, and full effect may be given to both, as though they were parts of the same Statute.
We are, therefore, of opinion, that it can not he said, sec. 603 of the Code operated as a repeal of sec. 12 of the Act of 1838.
That the Legislature itself, was of the same opinion, is evidenced by the fact, that, by express enactment, it did declare the said twelfth section repealed in 1865.
We come now to the consideration of more important questions. What effect is to be given to the said twelfth section of said bank charter, and to the repeal thereof in 1865 ?
The caption of the Act states the purpose of the Act to be, “ To establish a State Bank, to raise a fund for Internal Improvements, and to aid in the establishment of a system of Education.”
By the first section it is declared: “ That a bank shall be, and is, hereby established, in the name, and for the benefit of the State, to be known under the name and style of ‘ The Bank of Tennessee;’ and the faith and credit of the State are hereby pledged for the support of the said bank, and to supply any deficiency in the funds hereinafter specifically pledged, and to give indemnity for all loses arising from such deficiency.”
*442 And, by the 2nd section, the whole of the Common School Ennd, whether the same had been invested in bank stock, or was in the hands of the Superintendent of Public Instruction, or of county agents, or other persons, except so much as may have been invested in works of internal- improvement, as well as the proceeds of the Ocoee lands, and the surplus Federal revenue on deposit with the State, together with the unexpended interest thereon, was constituted a part of the capital stock of said bank.
By sec. 8, it was provided, among other things, “that of the dividends which shall be declared by the bank, one hundred thousand dollars shall be annually set apart for common schools, and the faith of the State is hereby pledged for an annual appropriation of said amount to common schools, to be applied as the General Assembly may direct. Of the dividends of the bank remaining, there shall be annually appropriated, for thirty years, and no longer, or not so long, if the bank should not continue so long in operation, eighteen thousand dollars to county academies, to be applied as the General Assembly may direct, and the faith of the State is hereby pledged for the payment of said sum.”
These are funds referred to in the first section of said Act, as “ funds hereafter specifically pledged,” and to supply any deficiency to which “the faith and credit of the State,” were pledged.
The ordinary banking powers and privileges, including the power to issue bills or notes, designed to pass as currency, were conferred upon the bank: and *443 for its support, the faith and credit of the State were pledged. For certain purposes .it was constituted a fiscal agent of the State; and, as a means of further aiding in the accomplishment of -the charter, it was declared that the bills or notes of the bank, of a certain description, should be receivable at the treasury of this State, and by all tax collectors and other public officers, in all payments for taxes, or other moneys due to the State.
The bank was organized, and went into operation under the provisions of its charter — issued its bills or notes, which were put into circulation as money, and passed currently at par value, and were faithfully and promptly received by the State, in payment of all moneys due it, until the disastrous period in the history of the country, when the bank and its assets were seized by the persons engaged in a hostile armed rebellion against the lawful authorities of the government of the United States; who, without authority of law, and for the purpose of aiding the rebellion, removed the same beyond the limits of the State. But for the decision of this case, we do not deem it necessary to express any opinion as to the effect of this treasonable seizure, removal and appropriation of the assets of the bank, upon its subsequent transactions, or of the ultimate liability of the State for its lawful issues, or of the rights of parties, under the twelfth section of the charter, who may have been engaged in that rebellion.
But, it is insisted, the revenue officers of the State are bound to receive the notes of the bank, *444 issued prior to tlie 6th of May, 1861, in payment for taxes due the State, under a contract between the State and holders of the notes of the hank, and that this is so, whether the party, offering the same in payment, received the notes before or since the repeal of the twelfth section of the hank charter; and, in support of this position, the case of Woodruff vs. Trapnall, 10 Howard, has been recited and relied on. While that case is like this in some, it is wholly dissimilar in other important features.
The State of Arkansas brought suit against Wood-ruff and his securities, upon his official bonds, as Treasurer of the State, for the • recovery of a sum of money alleged to have been received by him as treasurer, between the 27th day of October, 1836, and the 26th day of December, 1838. In 1845 a judgment was rendered against Woodruff and his securities. On the 24th day of February, 1847, an execution having been issued upon the judgment, Wood-ruff tendered to Trapnall, the Attorney General, the full amount of the judgment, interest, and cost, in the notes of the Bank of the State of Arkansas, which were refused.
The Bank Charter was passed on the 2d day of November, 1836, the twenty-eighth section of which provided: “That the bills and notes of said institution shall be received in all payments of debts due to the State of Arkansas.”
On the 10th day of January, 1845, this section was repealed. From this brief statement, it will be seen that the indebtedness of Woodruff accrued before *445 the repeal of the twenty-eighth section of the bank charter, while the same was in full force; while, in the case under consideration, the indebtedness accrued after the repeal of the twelfth section of the Charter of the Bank of Tennessee.
Judge McLean, in delivering the opinion of a majority of the Judges of the Supreme Court of the United States, in the case of Woodruff vs. Trapnall, said: “It is admitted he (Woodruff) had the notes in his possession at the time he. made the tender, and that they were issued by the Bank before the repeal of the section, and nothing more than this could he required.” But it will be observed that this opinion was based upon the assumption that the twenty-eighth section of the charter had' the effect of a guarantee, running with the notes, and included all the notes of the bank in circulation, at the date of the repeal, as clearly as if on the face of every note the words had been engraved, “ This note shall be received in payment of debts.” While we regard the opinions of the Supreme Court of the United States as of very high authority, still the force of this opinion is very much weakened by the fact that four out' of nine judges, (being unable to agree with the majority,) delivered dissenting opinions.
A contract is defined to be an agreement, between competent persons, to do, or not to do, a certain thing. The contract, in this case, was not made with the bank. No franchise was conferred upon it by the twelfth section of the charter, and, under it, the bank could acquire no rights.
*446 It was merely a fiscal agent of the State. Then, with whom was it made? We answer, there was a contract with a bona fide holder of the notes of the hank, lawfully issued, who received them prior to the repeal of the twelfth section of the Act chartering the bank. The State proposed to receive the notes of the hank from its debtors; but, suppose the bank had put none of its notes in circulation, then, notwithstanding the provisions of the twelfth section, could it be insisted that any agreement had been entered into between the State and any one, by which the State ha.d contracted to receive the notes of the Bank? Certainly not.
The proposition was to persons about to become the holders of the notes of the Bank. To them the State said: “In order to accomplish the objects of this charter, and in consideration of the benefits which I will derive thereby, if you will give credit to the notes of this bank, and receive them. I will receive them from you in payment for tases and other dues. And when, thereupon, the party to whom the proposition is made, in consideration of this promise, upon the part of the State, -receives the notes of the Bank, the contract becomes complete between the State and the party who receives the notes. The consideration moving the State was good and sufficient; but there was no contract whatever, between the State and persons who had received none of the notes of the bank.
So long as the twelfth section remained upon the Statute book unrepealed, there was a continuing proposition, upon the part of the State to its citizens, if *447 you will receive the notes of the bank as money, the State will receive them from you in payment of your dues to the State; and if a second party is thereby induced to receive them from the party who received them from the bank, the proposition of the State is thereby accepted by the second holder, and, upon its acceptance, another contract becomes complete, as between the second holder and the State, by which the second holder of the note is entitled to discharge his indebtedness to the State in the notes of the bank, not because of any imaginary guarantee upon the part of the State, running with the note as a covenant seal running with land, nor because the second holder is substituted to the rights of the first holder, but, because, when the proposition of the State to him, that if he will receive the notes as money, it will receive them from him in payment of taxes and other dues, is accepted by the receipt of the notes, a separate, distinct, and independent contract is made; and thus, as long as the proposition is continued, contract after contract springs up between the State and persons into whose hands the notes may successively pass.
There is no guarantee, whatever, upon the face of the note, or in any other manner acompanying it. The obligation of the State springs alone out of the Statute, as it remains in force at the time of the acceptance of the notes.
It is conceded, in argument, that the State had the right, at its own pleasure, to repeal the twelfth section of the bank charter. This being so, every one into whose hands the notes passed, received them with a full *448 knowledge of the fact, and gave them credit accordingly; and no one can, therefore, complain of a breach of faith upon the part of the State in repealing the section, or of the legal consequences which follow the repeal.
The repeal operated merely as a withdrawal, by the State, of the proposition, and, consequently, there could have been no contract between the State and' persons into whose hands the notes passed subsequent to the repeal in 1865. The mutual agreement of parties, either express or implied, is indispensable to constitute a contract.
The case under consideration is distinguished from the case of Woodruff vs. Trapnall, in at least one important feature. In the latter case the Court said: “ The entire stock of the Bank is owned by the State. It furnishes the capital and receives the profits.” How is it in this case? The Common School Eund, as well as the surplus revenue of the United States, deposited with the State, under an Act of Congress, approved June 23d, 1836, and constituted a part of the capital of said Bank, were trust funds, which the State held merely as a trustee. The surplus revenue was merely a deposit with the State, and for its safe keeping, and to the re-payment thereof from time to time, whenever required by the Secretary of the Treasury, the faith of the State stood pledged. The State held the fund known as the Common School Eund, as trustee, for the purpose of educating the children of the State; and it was regarded so sacred, that, by Art. 11, sec. 10, of the Constitution of the State, it is provided as follows: “And the fund, called the common school fund, and all *449 the lauds and proceeds thereof, dividends, stocks, and other property, of every description whatever, heretofore by law appropriated, by the Greneral Assembly of this State, for the use of common schools; and all such as shall hereafter be appropriated, shall remain a perpetual fund, the principal of which shall never be diminished by legislative appropriations; and the interest thereof shall be inviolably appropriated to the support and encouragement of common schools throughout the State, and for the equal benefit of all the people thereof; and no law shall be made authorizing said fund to be diverted to any other use than the support and encouragement of common schools.
But enough has already been stated, to show that one of the prime objects of the charier, was, to so provide, that this trust fund should yield a profit, and to apply the same to the purposes of the trust. It cannot, therefore, be said the capital of the bank belonged exclusively to the State, as did the capital of the Bank of Arkansas, or that it received the profits thereof. But it has been argued, that the principles of the case of Woodruff vs. Trapnall, have been recognized and re-affirmed, in the cases of Paup et al. vs. Drew, and of Trigg et al. vs. Drew, 10 Howard; Curran vs. The State of Arkansas, 15 Howard; and Hawthorne vs. Calef, 2 Wallace. The cases of Paup vs. Drew, and Trigg vs. Drew, were decided at the same term of the Court, the case of Woodruff vs. Trapnall was decided; and although in the former the latter is referred to, we think it may well, be *450 doubted whether the conclusions arrived at in the different cases, can he harmonized upon the principles of the case of Woodruff vs. Trapnall; but, be that as it may, Judge McClean, who also delivered the opinion of the Court, in the cases of Paup vs. Drew, and Trigg vs. Drew, in the former case, says: “In the case of Woodruff vs. Trapnall, 10 Howard, 190, decided at the present term, this Court held, that the 28th section in the charter, constituted a contract between the State and the holder of the bills of the bank; that the pledge of the State to receive the notes of the bank in payment of debts, was a standing guarantee, which embraced all the paper issued by the bank, until the guarantee was repealed; and that this construction was founded upon the fact, that the bank belonged exclusively to the State — was conducted by its officers, and for its benefit.”
Although it does not so distinctly appear in the opinion, in the case of Woodruff vs. Trapnall, upon what ground the conclusion in that case was arrived at, still, it is distinctly stated by the same Judge, at the same term of the court, that the construction given to the contract, was founded upon the fact, that the bank belonged exclusively to the State, was conducted by its officers, and for its benefit.
Here there is a broad distinction between that case and this. They rest upon different principles; and were we to give that case full weight as conclusive authority upon the questions involved therein, it cannot have the effect contended for in this case, if the *451 case of Paup et al. vs. Drew, is to be regarded as authority.
In the case of Curran vs. the State of Arkansas, 15 Howard, the charter of the bank contained a pledge, or assurance, that certain funds deposited therein, should be devoted to the payment of its debts. These funds were withdrawn by Acts of the Legislature. A bill was filed against the State of Arkansas, and the Bank of the State of Arkansas, and the officers of the bank, by a creditor of the bank. The Court held that the pledge, or assurance, constituted a contract with the creditors, and that the Acts of the Legislature withdrawing these funds, were void as impairing the obligation of the contract.
The case in 2 Wallace, relied on in argument, sustains the opinion of the Court in the foregoing case, and also in the case of Woodruff vs. Trapnall, as it was understood in the case of Paup et al. vs. Drew. We do not conceive that any of these cases conflict with this opinion.
In the case of Curran vs. The State of Arkansas, it is said: “That the State, by becoming interested with others, in a banking corporation, or by owning all the capital stock, does not impart to that corporation any of its privileges or prerogatives; that it lays down its sovereignty, so far as the transactions of the corporation are concerned, and exercises no power or privilege in respect to those transactions not derived from the charter, has been repeatedly affirmed by this Court.”
*452 But the transactions of the corporation, do not form the subject-matter involved in this controversy; and the question here is not, to what extent is the State liable because of its interest in the banking corporation; but it is, to what extent is it bound by An Act of the Legislature, which provides that the notes of the corporation, shall be receivable by the State, in payment of taxes and other dues?
The provisions of the first section of the bank charter, by which the faith and credit of the State, are pledged for the supjDort of the bank, can exercise no influence in determining the rights of the petitioners in this application. The question as to the ultimate liability of the State for the issues of the bank, cannot be determined in this proceeding, or in any proceeding between the parties now before the Court.
"We regard it as well settled, that a State can no more impair the obligations of its own contract, by legislation, than it can impair the obligations of contracts between individuals; and that all legislation, the effect of which is to impair the obligation of a contract, is unconstitutional and void.
But the question, whether there was a contract between the State and the petitioners in this case, must be determined by the same rules which would determine a similar question between individuals; and when the fact of the contract is once ascertained, the action of a sovereign State should be characterized by a more scrupulous regard to justice, morality, and promptness, than belong to the ordinary transactions of individuals.
*453 But wbat contract between the State and the peti-iitioners, was impaired by the repeal, in 1865, of the 12th section of the bank charter? We answer, none. They do not aver that, at that time, they were the bona fide holder's of the notes .of the bank, which they have since tendered in the payment of taxes due the State.
It has been insisted, that, to' hold, the debtor to the State has the right to pay his debts in the issues of the bank, when they are greatly below par, would be equivalent to holding, that a Legislature has the power to tie up or destroy the revenues of the State, so as to defeat the ends of the Government itself. We do not think so. While it is true, that, while, on questions of general policy, one Legislature cannot bind those which shall succeed it, still, one Legislature may, undoubtedly, make a contract which shall bind those that shall come after it. No one will question the general power of the Legislature, to declare, by law, in what the revenues of the State may be paid. This, however, is under the control of the Legislature, and may be changed at any time.
The power to levy taxes, is a power belonging to sovereignty, which can never be exhausted as long as sovereignty itself continues, the exercise of which is regulated and restrained by the discretion of the Legislature. As a matter of necessity, the right to exercise this power, must be lodged somewhere; and with this right, we must confer a confidence, that it will be exercised solely with a view to the accompli^htSenf'O'f the legitimate purposes of revenue.
*454 Suppose it was necessary to carry on the affairs of the Government, that the sum of one million dollars of par funds be raised by taxation, and there was one million dollars of the issues of the Bank of Tennessee in circulation, which was worthless, which the holders had the right to pay in discharge of their taxes; looking to these facts, the Legislature certainly would have the right, .as it would be its duty, to levy taxes, with the view to the raising two millions of dollars of revenue, thus raising a sum sufficient to meet the expenses of the Government, over and above the amount of worthless paper which the State might be bound to receive.
Upon the question, whether a bona fide holder of the notes of the bank, who received the same prior to the repeal of the twelfth section of the charter, has or has not the right to pay taxes which have accrued to the State since the repeal, we express now no opinion.
We are 'satisfied, that to entitle a party to pay his taxes in the notes of the bank, they must have been lawfully issued, and . such person must have become the bona fide holder of such notes, before the repeal of the twelfth section of the charter. The petition, in this case, does not aver that the notes tendered, had been lawfully issued, or, in other words, that they were the legitimate issues of the bank, and that Fur-man had become the bona fide holder of the notes prior to the repeal.
We are, therefore, of opinion the judgment of the Circuit Court, overruling the demurrer to the petition, was erroneous, and must be reversed. The demurrer will be allowed, and the petition dismissed.